# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KITTIVATH ERNIE INTHAVONG,<br><br>Defendant. | Case No.: 2:21-cr-00291-JCM-NJK<br><br>**ORDER AND<br>REPORT AND RECOMMENDATION**<br><br>[Docket No. 29] |

This matter was referred to the undersigned Magistrate Judge on Defendant's motion to suppress evidence. Docket No. 29. The Court has considered Defendant's motion and exhibits, the United States' response, and Defendant's reply. Docket Nos. 29, 30, 31, 34, 35.

## I.   BACKGROUND

On November 9, 2021, a grand jury sitting in Las Vegas, Nevada issued an indictment charging Defendant with two counts of felon in possession of firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Docket No. 1. Defendant now asks the Court to suppress all physical evidence obtained pursuant to the search warrant and all inculpatory statements made during his August 11, 2021 interview. Docket No. 29.

### A.  Nevada Search Warrant

On August 10, 2021, a Nevada state court judge issued a search warrant for Defendant's residence and various vehicles connected with him. Docket No. 30-4. The warrant provided authority for Las Vegas Metropolitan Police Department ("LVMPD") officers to search for, *inter alia*, firearms, firearm accessories, ammunition, epithelial cells from Defendant, and Defendant's cell phone. *Id.* at 3-4.

The affidavit in support of the warrant stated that LVMPD officers were searching for evidence related to two criminal offenses: murder with a deadly weapon and prohibited person possession of a firearm. *Id.* at 7. The affidavit stated that the investigation was being done in

conjunction with investigators from Riverside County Sheriff's Department ("RCSD") in California and was being sought to further investigations that had been ongoing in California since September 2020. *Id.* at 8-13.

The affidavit set forth that Defendant was a possible suspect in seven homicides that occurred in Riverside County, California on September 7, 2020, and was suspected of being involved in a robbery in which occurred on September 2, 2020, in Anza, California. *Id.* at 8. The affidavit further stated that a records check for Defendant indicted that he was a three-time felon and that he had sent a text message in May 2021 asking his wife to bring him an automatic rifle and a Glock 21 handgun. *Id.* at 8-10, 36.

The affidavit stated that the victim identified Defendant as a suspect in the robbery, that his cell records placed him near the location of the robbery during the relevant timeframe, and that seven 9mm cartridge cases and one rifle cartridge case were located at the scene of the robbery. *Id.* at 8. The affidavit further stated that California detectives had obtained Defendant's cellular information, including his iCloud account, which had provided them both his cell number and displayed the text message to his wife about his wife bringing him guns. *Id.* at 9-10. The affidavit stated that a ping order for Defendant's cell phone placed him in Las Vegas on August 3, 2021. *Id.* at 10. The affidavit described investigative work out of California that determined Defendant had a vehicle registered to this residential address in Las Vegas and that his name appeared on utility bills for that address. *Id*. at 9. The affidavit further stated that physical surveillance resulted in observing Defendant at that residential address with a silver Acura that was registered to his mother but used by him. *Id*.

**B.  RCSD Search Warrant**

The affidavit attached an affidavit from RCSD in support of a California search warrant issued on August 3, 2021. *Id.* at 16-42. The RCSD affidavit stated that the ongoing investigations began with RCSD's Central Homicide Unit responding to a scene in Anza, California, where seven individuals, all of whom were "involved in the marijuana industry," were shot multiple times. *Id.* at 26. Six of the individuals died at the scene and the seventh died at the hospital. *Id.*

2

The RCSD affidavit set forth that, on September 17, 2020, a citizen informant, Mark Tate, approached patrol officers, told them that Defendant was involved in the murders, and provided them with a photograph of Defendant's driver's license. *Id.* The officers talked to Tate on the phone the following day and asked him to confirm the information he provided, as well as further questions about how Tate knew the information about Defendant. *Id.* Tate responded that he worked as a maintenance worker in the area, knows the local Laotian community through his work and on account of his wife being Laotian, and was recently approached by a group of seven Laotian individuals who gave him the photo of Defendant's license and requested that he provide it and the information that Defendant was involved in the homicide to the police, which he did. *Id.* The affidavit stated that the affiant's training and experience caused him to know that providing a photocopy of a driver's license is a common practice in the marijuana industry, as a means of identification and accountability for production and distribution, which he believes Defendant did at some point. *Id.* at 27.

The RCSD affidavit stated that, on February 25, 2021, two RCSD investigators followed up with Tate about the information he provided. *Id.* Tate confirmed his previous statements, told the investigators that he heard a rumor that the homicide was over an unpaid debt, and provided the address for a person that he claimed was the individual who gave him Defendant's ID photo. *Id.* Officers determined that this address was an abandoned marijuana grow house. *Id.*

The RCSD affidavit further stated that investigators conducted a records check of Defendant and learned that he had an extensive criminal history, including weapons and drug charges, resisting arrest, assault with a deadly weapon, and domestic violence. *Id.* This record check listed "numerous addresses" in San Diego associated with Defendant; however, they were unable to locate him at any of those addresses. *Id.* at 27-28. Investigators also learned from a confidential informant that the person who committed the homicides was an individual who was a member of the Oriental Killer Boys ("OKB"), a criminal street gang in San Diego, who went by the name "Kojack." *Id.* at 27.

In February 2021, the RCSD affidavit stated, investigators learned from the San Diego Police that Defendant and Kojack, (whom that had identified as Chanthala Thammavongsa), were

both documented OKB members and that Thammavongsa had a lengthy criminal history, including murder and attempted murder offenses. *Id.* at 28. Investigators also learned that one of Defendant's vehicles was registered in Nevada, at an address where his name was also seen on utility bills. *Id.* Amna Nassr-Mendoza's name was also listed on the bill and investigators learned that she was listed as his wife on California prison records, where she had visited him routinely. *Id.*

The RCSD affidavit stated that investigators conducted visual surveillance of this Nevada residence on March 18, 2021, and positively identified Nassr-Mendoza at the location. *Id.* Investigators also observed Defendant leaving the residence and getting into a silver Acura that was registered to Defendant's mother. *Id.* On September 9, 2020, days after the murder, this vehicle had an Advanced License Plate Reader System hit. *Id.* The vehicle's history check showed that it had mainly been in California for the previous year, specifically in the Riverside County and San Diego County area, but had not been there since the murder. *Id.*

The affidavit set forth that RCSD officers, working with law enforcement officers in Las Vegas, obtained a search warrant to use a Cell-Site Simulator to identify Defendant's cellular phone number, and identified two specific cell phone numbers associated with locations Defendant was known to frequent, leading investigators to believe that Defendant carried two cell phones with him and used both of them. *Id.* at 29. Investigators obtained another search warrant and were able to determine that one of the numbers, 619-885-5258, was associated with Defendant and related to this investigation. *Id.* at 30. Officers reviewed the cell phone records for that number and determined that the phone "was not in the area of the homicide on the day of the homicide but was in the general area of the scene about three to four days prior to the homicide." *Id.* The affidavit specifically stated that investigators could not exclude Defendant as a suspect. *Id.*

The RCSD affidavit stated that, on April 13, 2021, investigators learned that Mark Tate had been found dead at an address in San Diego. *Id.* San Diego law enforcement officers told RCSD investigators that they had spoken to the owner of the residence, who had arrived home to see Tommy Thammavong and Tate in front of his house, attempting to collect a debt from the homeowner's nephew for some allegedly stolen marijuana. *Id.* At one point, Tate had entered the

residence, brandished a pistol, and demanded money and property from the homeowner. *Id*. The homeowner had wrestled the gun from Tate and shot him "seven times in self-defense," killing him. *Id*. The affidavit stated that, while processing the scene, investigators saw that Tate was wearing latex gloves and a gun holster but did not have his cell phone. *Id*. Investigators located a large amount of packaged marijuana at the house, which they believed to be the stolen marijuana. *Id*. While canvassing the neighborhood, investigators learned that, before he was shot, Tate had used a badge to convince individuals he was a member of law enforcement while he knocked on doors searching for and asking questions about the homeowner who ended up shooting him. *Id*.

The affidavit stated that investigators followed up with the homeowner's nephew and learned that Tate was known as a hitman. *Id*. They also spoke to Tate's brother, who told them that Tate's wife and her father introduced Tate to the marijuana industry, as they own and manage numerous marijuana grows. *Id*. Further investigation found that Tommy was a documented OKB. *Id*. at 31. The affidavit states that the investigators were unable to explain why Tate gave them the information naming Defendant as a suspect for the homicide, except to mislead law enforcement or deter them away from Tate and Tommy as potential suspects. *Id*. Investigators reviewed Tate and Tommy's cellphone records, which do not put them at the scene of the homicide on the day it occurred. *Id*.

The affidavit states that, in May 2021, the RCSD Investigator learned that there had been a robbery investigation in Anza, where deputies had received several calls reporting the sounds of gunfire, yelling, and vehicles at around 9 p.m. on September 2, 2020. *Id*. Deputies arrived on the scene at 9:36 p.m. and saw two subjects near a dark pickup truck at the location. *Id*. One of the subjects, Frederic Thongsythavong, had a loaded 45-caliber pistol and told the deputies that his friend Toon had called him, reporting she was being robbed and needed help. *Id*. Frederic gave the deputies Toon's number. *Id*. Deputies also observed an unoccupied dark Toyota Highlander in the area, with a warm engine, that was registered to Hakeem Sengsone. *Id*.

While searching the scene, the affidavit states, deputies located seven expended 9mm cartridges, one expended rifle cartridge, and young marijuana plants. *Id*. at 32. Deputies then asked Frederic to call Toon, so they could ask her about the robbery. *Id*. Toon said she was

"scared to return to her residence because of the marijuana." *Id.* Deputies were able to speak with Somphone Douangy, Toon's friend, who told them that Toon told her three males had entered her house, hit her in the face with a firearm, and stole her phone, money, jewelry, and passport. *Id.* Toon's friend said she observed a wound on Toon's face consistent with her story, but that Toon said she did not want to be contacted by law enforcement because she did not want to be arrested for growing marijuana. *Id.* The affidavit further states that officers do not know if she possesses her cell phone or if the suspects stole it, but they have not tried to call Toon's cell number because they were concerned that she would drop that phone once contacted by police. *Id.* A review of the records of the homicide victims shows that three of the victims communicated with Toon - two on the day of the robbery and one earlier that month. *Id.* The affidavit further states that Toon has never been identified and her current whereabouts are unknown. *Id.*

The affidavit states that, on September 3, 2020, Sengsone's girlfriend contacted the San Diego police to report his Toyota Highlander missing. *Id.* Investigators talked with Sengsone, who reported that he had parked the Highlander at his house on September 2, 2020, but it was gone when he woke up the next morning. *Id.* A record check of Sengsone reported a criminal history that includes attempted murder and felony evading police. *Id.* Records also show that Sengsone has two phone numbers. *Id.* The affidavit states that Defendant's cell records showed that he communicated with both of Sengsone's numbers. *Id.* The affidavit states that Defendant's cell records put him "at or near the scene of the robbery on September 2, 2020." *Id.* at 33. The RCSD investigator also obtained search warrants for Toon's and Sengsone's cellphone records and learned that Sengsone's phone was near the scene of the robbery on the day of the robbery and that Toon's phone had no outgoing calls on the day of the robbery, indicating that it was possibly stolen and/or deactivated following the robbery. *Id.*

The RCSD affidavit states that, on June 6, 2021, the investigator spoke with Toon's friend, who reported that Toon had moved to Northern California and shared "second hand information from Toon" that she was robbed by three individuals of money and her cellphone, and that one of the individuals was someone Toon recognized named "Roscoe." *Id.* Toon's friend stated that she also knew Roscoe and, when the investigator sent her a photo of Defendant, she identified him as

the person she knows as Roscoe. *Id.* The affidavit states that Toon's friend said that "she knew Roscoe, communicated with him in the past by telephone and he was a person involved in the Marijuana business." *Id.* Toon's friend also gave RCSD a new contact number for Toon, and a records search later found that this number had communicated with one of the homicide victims on the day of the homicide. *Id.* The RCSD affidavit states that, on June 8, 2021, law enforcement was able to speak with Toon at this new number and she confirmed her previously reported statements about the robbery but refused to disclose either her identity or address. *Id.*

The affidavit states that, after learning that three individuals were involved in the robbery, the RCSD investigator reviewed Defendant's and Sengsone's phone records for the day of the robbery – the records showed that they did not communicate with one another but that they did communicate with a common third number. *Id.* Investigators then conducted additional investigations to locate and surveil Sengsone, which caused them to believe he was one of the suspects in the robbery. *Id.* The affidavit states that, on July 8, 2021, a search warrant was executed on Sengsone's residence, vehicles, person, and cell phones, resulting in the seizure of firearms and ammunition. *Id.* at 35. Investigators also interviewed Sengsone when they executed the search warrant and asked him about the robbery and homicide. *Id.* The affidavit states that Sengsone denied involvement in the homicide but invoked his right to have an attorney present when asked about the robbery. *Id.*

The RCSD affidavit states that, on July 15, 2021, Apple Inc. provided data pursuant to a search warrant for the iCloud accounts of both Defendant and Sengsone. *Id.* This data included various text messages from Defendant's account indicating connections to the location where the robbery occurred and the potential planning of a robbery the day before the homicides. *Id.* at 35-36. The affidavit states that records checks of the number associated with these messages show that the individual with whom Defendant was communicating was arrested in November 2020 for a homicide related to the marijuana industry. *Id.* at 36. The data also included a text from Defendant's wife containing a link about the homicide the day after it occurred. *Id.* The affidavit states that the data also included an image of a message sent from Defendant to his wife on May 27, 2021, asking her to bring him, among other things, his assault rifle and Glock 21 handgun from

7

a friend's house. *Id.* The affidavit states that this text message suggests that "Defendant has access to firearms and he is a convicted felon, which makes it illegal for him to possess or own firearms." *Id.*

The RCSD affidavit supports a request for a tracking warrant of Defendant's 5258 cellphone for a period of 30 days so that RCSD could locate him and serve a search warrant at his residence to "search for any evidence, such as firearms and cellphone devices, related to the robbery and/or homicide." *Id.* This warrant was issued on August 3, 2021. *Id.* at 16-17.

The Nevada search warrant was executed by LVMPD on August 11, 2022. *See* Docket Nos. 30 at 2-11; 30-4 at 43-46. Defendant was not present at the house, but two other individuals were. Docket No. 30 at 8. Multiple firearms were located and seized pursuant to the search warrant. Other firearm accessories were also seized. Docket Nos. 30 at 7-10, 30-4 at 43-45.

**C. Defendant's August 11, 2021 Interview**

On August 11, 2021, LVMPD Officers Gyger and Fonbuena, LVMPD Detective Deeds, and RCSD Detective Sanborn observed Defendant driving a van to work at a department store. Docket No. 30 at 7. At 10:40 a.m., Gyger, Fonbuena, Deeds, and Sanborn approached Defendant inside the store and informed him about the search warrant for his house and vehicle. *Id.* The Detectives asked Defendant if he would speak with them about the ongoing investigation in California at LVMPD headquarters. *Id.* Defendant agreed and was transported to LVMPD headquarters. *Id.* Before transporting Defendant, the officers recovered the keys to his work van. *Id.* Deeds and Seaborn served the search warrant on Defendant's work van at 11:15 a.m., using the keys recovered from Defendant to open the vehicle. *Id.* While searching Defendant's vehicle, officers recovered a black backpack containing two firearms, a holster, and magazines. *Id.* at 7-8; *see also* Docket No. 30-4 at 43.

Defendant was interviewed for three hours by LVMPD Detective Grimmett, and RCSD Investigators Trudeau and Magana. *See* Docket Nos. 30-5, 31. In his motion, Defendant goes into length regarding the facts underlying the statement. Docket No. 29 at 10-17. As the United States has represented that it will not use the statement in its case-in-chief, however, the Court need not address the statement.

## II.    ANALYSIS

Defendant asks the Court to suppress two categories of evidence: all physical evidence obtained pursuant to the search warrant executed on August 11, 2021, and all statements made by Defendant during his interview on August 11, 2021. Docket No. 29. Defendant further asks the Court to suppress all fruits of this evidence. *Id.* at 24. The Court will address each suppression request separately.

### A.  Defendant's August 11, 2021, Interview

Defendant asks the Court to suppress all statements made during his interview with law enforcement on August 11, 2021. *See* Docket No. 29. In response, the United States submits that it will not seek to admit these statements in its case-in-chief at trial, but that the statements remain admissible as impeachment evidence. *See* Docket No. 34.

Based on the United States' assurance that it will not use these statements in its case-in-chief, the Court **DENIES** without prejudice Defendant's motion regarding his statements. To the extent the United States believes these statements are admissible for impeachment purposes, that decision is best left to the trial court who will have heard the testimony.

### B.  *Franks* Challenge to the August 11, 2021, Search Warrant

Defendant next asks the Court to suppress all evidence seized from his residence and vehicles pursuant to the search warrant executed on August 11, 2021. Docket No. 29 at 17-23. Defendant submits that the connections between the murder and robbery investigations were tenuous and that the affidavits used to support the warrants omitted the material facts. *Id.* at 17-18. Specifically, Defendant submits that the affidavits represent that Defendant was a suspect in the seven-person homicide in California in September 2020, but he had already been ruled out as a suspect before the warrants were applied for, after the investigators had discovered that the informant who led them to believe Defendant was involved may have been misleading law enforcement to avoid detection. *Id.* at 18-19.

Defendant further submits that the affidavit, without this information, did not establish probable cause to believe that Defendant was involved in the September 2020 robbery to support a warrant, as the informant law enforcement relied on was unreliable and the informant's

information and the other evidence used to support probable cause provided only tenuous connections to the robbery. *Id.* at 19-23. Specifically, Defendant submits that the informant provided secondhand information from another person who never affirmatively identified Defendant as the person she knew to have the nickname she provided, the informant had connections to the homicide, and law enforcement identified this third person but did no confirmatory investigation of her identification of Defendant. *Id.* at 20-21. Defendant submits that officers also relied on isolated communications between Defendant and another suspect in the robbery, before and after the incident, to allege that they knew one another and committed crimes together, based on knowledge of each individual's criminal history, despite the age of the convictions. *Id.* at 21-22. Finally, Defendant submits that the affidavit states that Defendant was near the scene of the robbery, which is never defined geographically, and had texted about having someone bring him guns two months before the warrant at issue in this motion was sought. *Id.* at 22-23. Defendant submits that the affidavit's narrative was convoluted and did not establish probable cause as there was no indication that the fruits of the California offenses would be in Nevada a year after the crimes occurred. *Id.* at 23.

In response, the United States asks the Court to deny Defendant's request to suppress the evidence seized pursuant to the search warrant. Docket No. 34 at 4-9. The United States submits that the warrant at issue was supported by probable cause and there is a sufficient basis to conclude that probable cause was established. *Id.* at 4-5. The United States submits that the affidavit contained details connecting Defendant to the robbery, including his identification by the victim, cell phone records connecting him to the area, and connections to the owner of a vehicle found at the scene of the incident. *Id.* Moreover, the United States submits that the affidavit contained details about connections between the victims of the homicide and robbery, as well as messages sent by Defendant instructing his wife to bring him firearms, leading to a reasonable assumption that he was in Las Vegas at that time and the firearms were as well. *Id.* at 5. The United States further submits that the types of firearms in the affidavit matched the ammunition type that was located at the scene of the homicide. *Id.* Additionally, the United States submits that the affidavit

detailed the kinds of "direct and technical surveillance" that were conducted to confirm the address and vehicles to be searched. *Id.*

The United States further submits that the warrant, as issued, was sufficiently particular and not overbroad. *Id.* at 6-7. The United States submits that the warrant at issue was focused on searching for and seizing firearms, related firearm accessories, epithelial cells from Defendant, and previously identified cell phones. *Id.* at 7. The United States submits that these items were narrowly tailored to the purpose and needs of the investigation and that probable cause supported each request. *Id.* Finally, the United States submits that, should the Court find that the affidavit lacked probable cause, suppression is not warranted because the officers executing the warrant acted in good faith. *Id.* at 7-8. The United States submits that reliance on the subject warrant was objectively reasonable and, therefore, no police illegality occurred. *Id.* at 8.

In reply, Defendant submits that the affidavit materially misrepresented the ongoing RCSD investigation because it did not indicate that Defendant was not a suspect in the homicide, a fact that officers had already concluded based on cell phone data placing Defendant in Las Vegas on the day of the crime. Docket No. 35 at 4-6. Defendant submits that this misrepresentation was either intentionally or recklessly made, and warrants an evidentiary hearing on the issue. *Id.* at 5-6. Defendant submits that the officers had this cell phone data for nearly five months before applying for the warrant at issue and, in fact, communicated that they knew Defendant was in Las Vegas at the time of the offense during his interview on August 11, 2021. *Id.* at 6-8. Defendant submits that the language of the affidavit identified him as a possible suspect in the homicide which, at the very least, was reckless. *Id.* at 8-9.

Defendant further submits that, even if the Court finds the affidavit to not contain material misrepresentations and omissions, the warrant is still invalid because no probable cause exists to believe that the evidence being sought would be located at the house or vehicles identified in the warrant. *Id.* at 9-14. Defendant submits that the house and vehicle were identified based on a single day's cell site location information and visual surveillance seeing two vehicles parked in front of that residence, with Defendant's place of work identified on the side of one of the vehicles, which was a van. *Id.* at 10. Defendant submits that the affidavit acknowledges that a utility bill

11

and a registered vehicle identified a different address as Defendant's home address and no information suggests that the vehicles identified were solely used by Defendant, as one of them was registered to his mother and the affidavit states that officers had seen Defendant's wife drive that vehicle. *Id.* Defendant submits that there were no affirmative connections between Defendant and either this residence or the vehicles present there, as two of the vehicles had no connection with him whatsoever and officers had not observed him physically at the location. *Id.* at 10-12. Finally, Defendant submits that there was no probable cause to believe that firearms would be located at the residence or in any of the vehicles. *Id.* at 12-14.

Defendant asks the Court to conduct an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to determine whether the affidavit was sufficient to establish probable cause. Docket No. 29 at 17-19, 24.

In *Franks*, the Supreme Court discussed at length whether a false statement by a government affiant invalidates a search warrant. *United States v. Hammett*, 236 F.3d 1054, 1058 (9th Cir. 2001) (citation omitted). The Court held that, under certain circumstances, a defendant is entitled to an evidentiary hearing to afford the defendant an opportunity to attack the veracity of a facially valid affidavit used to support a search warrant. *See United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000) (citing *United States v. Stanert*, 762 F.23d 775, 780-81 (9th Cir. 1985)). A defendant can challenge a facially valid affidavit by making a substantial preliminary showing that "(1) the affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the affidavit cannot support a finding of probable cause without the allegedly false information." *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000) (citing *United States v. Stanert,* 762 F.2d 775, 780-81 (9th Cir. 1985)). See also *United States v. Meling*, 47 F.3d 1546, 1553 (9th Cir. 1995) (Defendant must establish that "the affidavit contained intentionally or recklessly made false statements [or omissions] and that the affidavit purged of its falsities would not be sufficient to support a finding of probable cause").

Before a criminal defendant is entitled to go beneath the search warrant to obtain additional information concerning the police investigation and an informant, he is required to make a substantial threshold showing. A defendant's preliminary showing cannot be "merely

12

conclusory." *Reeves*, 210 F.3d at 1044.  "There must be allegations of deliberate falsehood or reckless disregard for the truth, and these allegations must be accompanied by an offer of proof." *Hammett*, 236 F.3d at 1058 (quoting *Franks*, 438 U.S. at 171).  "To justify a hearing, a defendant must make specific allegations, allege a deliberate falsehood or reckless disregard for the truth, and accompany such a claim with a detailed offer of proof." *United States v. Craighead*, 539 F.3d 1073, 1080 (9th Cir. 2008) (citation omitted).  The movant bears the burden of proof and must make a substantial showing to support both elements. *See United States v. Garcia-Cruz*, 978 F.2d 537, 540 (9th Cir. 1992). *See also Franks*, 438 U.S. at 171-72 ("If, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required").

Intentional or reckless omissions may provide grounds for a *Franks* hearing.  *United States v. Jawara*, 474 F.3d 565 (9th Cir. 2007); *see also Stanert*, 762 F.2d at 781 ("By reporting less than the total story, an affiant can manipulate the inferences a magistrate [judge] will draw.  To allow a magistrate [judge] to be misled in such a manner could denude the probable cause requirement of all real meaning").  Although "[c]lear proof of deliberate or reckless omission is not required," a "[d]efendant 'must offer direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reason for omitting facts in order to prove a deliberate falsehood or reckless disregard." *United States v. Souffront*, 338 F.3d 809, 822-23 (7th Cir. 2003).  Generally, a misstatement in a probable cause affidavit is made with reckless disregard for the truth where the affiant displays a "high degree of awareness of probable falsity." *United States v. Senchenko*, 133 F.3d 1153, 1158 (9th Cir. 1998).  A defendant must also show that the "affidavit, once corrected and supplemented," would not "provide ... a substantial basis for concluding that probable cause existed." *Stanert*, 762 F.2d at 782.  "[T]he omission rule does not require an affiant to provide general information about every possible theory, no matter how unlikely, that would controvert the affiant's good-faith belief that probable cause existed for the search." *Craighead* 539 F.3d at 1081.

Here, Defendant has not made the substantial preliminary showing necessary for a *Franks* hearing.  His allegations are merely conclusory and are not accompanied by an offer of proof. *See*

*Craighead*, 539 F.3d at 1073. Defendant challenges a representation in the Nevada affidavit that he was a possible suspect in the September 2020 homicides in California because, he submits, RCSD officers had already definitively ruled his out as a suspect in the homicides. Defendant argues that, since his phone location data placed his phone in Las Vegas on the day of the homicides and the information establishing him as a possible suspect came from an informant, Mark Tate, whose lack of credibility surrounding the homicides and robbery was known to law enforcement at the time the affidavit was written, he was clearly no longer considered a suspect.[1]

However, the Nevada affidavit included, as an attachment that was expressly incorporated into it, the RCSD affidavit for a tracking warrant, written a week prior. *See* Docket No. 30-4 at 10, 15-42. That affidavit stated that Defendant's cell location information placed him in Las Vegas on the day of the homicide, but that other information available to investigators at the time resulted in them still considering him a possible suspect at that time. *Id.* at 30, 33. Moreover, the affidavit also spoke at length about Mark Tate, including the problems with his credibility. *Id.* at 30-31.[2] Therefore, he has failed to meet the first *Franks* prong.

Additionally, Defendant has failed to show materiality - that the omission of the information that he was a suspect in the September 2020 homicide would negate the probable cause in the affidavit. The probable cause standard for a search warrant is whether, based on common sense considerations, there was "a fair probability that contraband or evidence of a crime [would] be found in a particular place." *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir.1992) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The issuing judge need not determine "that

---

[1] At times throughout Defendant's briefing, it is difficult to discern precisely which warrant he is attempting to challenge, since he cites to the warrant issued on August 10, 2021 in some locations and to the warrant issued on August 11, 2021 in other locations. *See, e.g.*, Docket Nos. 29 at 18-19, 22-23; 35 at 4-5. Defendant's arguments, however, all go to suppression of evidence obtained pursuant to the execution of the August 11, 2021 warrant. The Court therefore limits its analysis to the August 11, 2021 warrant. However, the Court recognizes that the same attachments were included with the affidavits to both warrants.

[2] The Court is not persuaded to change its analysis by Defendant's submission that the RCSD investigator's statements to Defendant at the time of his statement clearly rule out Defendant as a suspect. *See* Docket No. 35 at 7. While the highlighted statements the investigator made to Defendant indicate that he may have been close to eliminating Defendant as a suspect, he had clearly not yet done so. Moreover, there is no legal requirement that officers be truthful to suspects. *See, e.g.*, *Frazier v. Cupp*, 394 U.S. 731, 739 (1969).

the evidence is more likely than not to be found where the search takes place.... The [issuing judge] need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit." *United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir.1991) (citation and internal quotation marks omitted). Neither certainty nor a preponderance of the evidence is required. *United States v. Kelley*, 482 F.3d 1047, 1050–51 (9th Cir. 2007), citing *Illinois v. Gates*, 462 U.S. 213, 246 (1983) and *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) *(en banc)*.

The affidavit in support of the search warrant included all the information about the ongoing California investigations into the robbery. This included information identifying Defendant as one of the perpetrators of the incident. Not only did the victim identify Defendant, but another witness identified him through a photograph as associated with a street name that the victim had used to name the perpetrator. Moreover, the affidavit included information tying Defendant to the location of the robbery on the day of the incident and showing communications with another identified suspect in the incident. Further, text communications supported inferences that Defendant might have been involved in the robbery and had access to weapons. The affidavit set forth that weapons were used in the robbery.

The affidavit also included information demonstrating that Defendant had been seeking to obtain guns close in time to when it was submitted to the Court. The affidavit included a text communication from Defendant specifically asking for two guns to be brought to him, as well as information that Defendant was a convicted felon, which would make any possession of a firearm a criminal offense. Moreover, two of Defendant's prior offenses involved the use of firearms. Considering the totality of the remaining evidence set forth in the affidavit, the Court finds that there was a substantial basis for finding that probable cause existed to believe that Defendant was involved in the robbery that happened on September 2, 2020, that he was a felon in possession of a firearm at the time the search warrant was sought and obtained, and that fruit of those crimes may be found in the locations to be searched. The Court therefore finds that the omission of the information regarding Defendant's status as a suspect in the homicide case does not negate

probable cause for the affidavit.  Therefore, the Court finds that Defendant has failed to meet the second *Franks* prong.[3]

The United States submits that the good faith exception applies, even if the Court finds probable cause lacking.  Defendant contends that it does not.

### III.    ORDER AND RECOMMENDATION

Based on the foregoing and good cause appearing therefore,

**IT IS ORDERED** that Defendant's request for a *Franks* hearing is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's motion to suppress his statements, Docket No. 29, is **DENIED** without prejudice.

**IT IS RECOMMENDED** that Defendant's motion to suppress evidence, Docket No. 29, be **DENIED.**

IT IS SO ORDERED.

DATED: September 15, 2022.

_____
NANCY J. KOPPE
UNITED STATES MAGISTRATE JUDGE

### NOTICE

This report and recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).  A party who objects to this report and recommendation must file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation.  Local Rule IB 3-2(a).  Failure to file a timely objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

---

[3] As the Court has found that the affidavit was supported by probable cause, the Court need not address the good faith argument in the briefing.  *See United States v. Leon*, 468 U.S. 897 (1984).

16